UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NO. 07-146 (DSD/JSM) |
| Plaintiff, | |
| v. | REPORT AND RECOMMENDATION |
| DAVID ISRAEL VELASCO (1), | |
| Defendant. | |

JANIE S. MAYERON, United States Magistrate Judge

The above matter came on before the undersigned upon defendant David Israel Velasco's motions to Suppress Statements, Admissions and Answers [Docket No. 18] and to Suppress Evidence Derived from Search and Seizure [Docket No. 23].

Christian S. Wilton, Assistant United States Attorney, appeared on behalf of the United States of America; Mark Larsen, Esq. appeared on behalf of defendant David Israel Velasco, who was personally present. The matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B).

Based upon the pleadings, the pre-hearing submissions, exhibits submitted at the hearing on May 30, 2007, and testimony taken from FBI Special Agent Andrew Mento, Jr., it is recommended that defendant David Israel Velasco's motions to Suppress Statements, Admissions and Answers [Docket No. 18] and to Suppress Evidence Derived from Search and Seizure [Docket No. 23] be **DENIED**.

I.   **FACTUAL BACKGROUND**

In late March and early April of 2007, Velasco made contact with a cooperating individual (CI) and agreed to sell the CI approximately 2 pounds of methamphetamine for $13,500 per pound. On April 4, 2007, the CI recorded several phone calls with Velasco, during which they arranged to meet at a hotel in St. Louis Park, Minnesota to conduct the transaction. Surveillance set up at the hotel observed two individuals arrive in a silver Volkswagen Golf, which was registered to Velasco. The CI approached the car, and Velasco showed him the methamphetamine. After the CI signaled to police officers, the officers approached. Velasco attempted to run, and officers apprehended and arrested him slightly before 2:00 p.m.

After the arrest of defendants, officers searched the car. On the floor of the passenger seat of the car, they recovered a loaded handgun in the cocked position. Officers also recovered slightly less than two pounds of methamphetamine, packaged in one-ounce quantities.

Following his arrest, Velasco was taken to the Violent Crimes Task Force office of the Minneapolis Police Department, which is an off-site location utilized by law enforcement. Velasco was placed in an interview room. At approximately 3:15 p.m., Special Agent Mento began to interview Velasco. The interview room was small and contained a table and three or four chairs. It was windowless, and had one door, which was locked. Special Agent Mento, Special Agent Sommerville and Velasco were present in the interview room. During the interview, Special Agent Sommerville moved in and out of the room, while Special Agent Mento remained in the room for the entire interview. Special Agent Mento testified that he could not recall if Velasco was or was

2

not restrained in handcuffs during the interview.  Special Agent Mento was dressed casually, and although he was armed, his firearms were not visible to Velasco.

At the beginning of the interview, Special Agent Mento made sure Velasco understood English, and then read Velasco his Miranda rights from a standard form used by the FBI.  Velasco signed the form acknowledging that he understood his rights. See Ex. 1.  The form was also signed by Special Agent Mento and Special Agent Sommerville.  Special Agent Mento then asked Velasco if he wanted to talk.  Velasco stated that he did not want an attorney, and agreed to speak with Special Agent Mento.

The interview lasted approximately one hour.  According to Special Agent Mento, Velasco understood the questions and gave appropriate responses.  There was no indication that Velasco was under the influence of drugs.

Special Agent Mento testified that the interview was heated at the beginning – that is, because he believed Velasco was lying and had a bad attitude, he was upset with Velasco and screamed at him.  Special Agent Mento also stated that he lectured Velasco about running from the police, and told him that he was "in a lot of trouble." Special Agent Mento could not recall whether he told Velasco how many years in prison he was facing if he was convicted.  Nor could he recall if he told Velasco that if he cooperated, "big things would happen."  Special Agent Mento did acknowledge that he and Velasco eventually discussed Velasco's cooperation in the case.

After Special Agent Mento determined that Velasco was becoming more truthful and cooperative, the tone of the interview became relaxed and remained that way for the balance of the interview. Throughout the interview, Velasco remained calm, was not crying, and did not give any indication that he was in any fear.  Velasco never requested

an attorney or indicated that he did not want to continue talking; he never requested a break or asked to use the bathroom. Special Agent Mento testified that he never made any threats or promises to Velasco.

During the interview, Velasco disclosed that he was staying in a room at 58XX University Avenue NE in Fridley, Minnesota. Special Agent Mento requested Velasco's permission to search his room. Velasco agreed and Special Agent Mento presented him with a consent-to-search form, which Velasco signed. See Ex. 2.

When Special Agent Mento determined Velasco was no longer being entirely truthful and the interview was no longer productive, Special Agent Mento ended the interview. Velasco was then transported to the Hennepin County Jail.

On April 5, 2007, Velasco was charged by a Complaint with conspiring to distribute, and possessing with intent to distribute, approximately 822 grams of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841 (b)(1)(A) and 846. See Docket No. 1. That same day, he made his initial appearance in federal court before United States Magistrate Judge Jeanne Graham. See Docket No. 2.

**II.    ANALYSIS**

   **A. Motion to Suppress Statements**

Despite his acknowledgement of his Miranda rights, Velasco argues that his statements to Special Agent Mento during his interview were involuntary and should therefore be suppressed. For the same reasons, Velasco claims that the evidence obtained from the subsequent search of his residence should be suppressed because his consent was involuntary, or was the fruit of his illegally obtained confession.

As a preliminary matter, the Court notes that there is no dispute that defendant was in custody at the time the statements were made, and that he was therefore entitled to a reading of his Miranda rights. There is also no dispute that Velasco properly received and acknowledged the Miranda warnings. See Defendant's Memorandum in Support of Motion to Suppress Statement and Its Fruits, p.1. Rather, Velasco argues that the statements he gave after he waived his Miranda rights were involuntary due to the coercive conduct of Special Agent Mento and the circumstances surrounding the interview.

"Although the requirement that a Miranda warning be given does not dispense with the voluntariness inquiry, 'cases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.'" Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001) (quoting Dickerson v. United States, 530 U.S. 428 (2000)). As there is no argument that Velasco's initial waiver of his Miranda rights was validly obtained, Velasco must then show that his subsequent statements were the product of coercion. Coercive police activity is a necessary predicate to the finding that a statement was made involuntarily. Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 522 (1986). "In considering whether a [statement] was voluntary, the determinative question is whether the [statement] was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired." U.S. v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998) (citing Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir.1988) (citation omitted)). "In making this determination, courts look at the totality of

5

the circumstances, including the conduct of the law enforcement officials and the defendant's capacity to resist any pressure." Id. (citing United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir.1990), cert. denied, 502 U.S. 829, 112 S.Ct. 101, 116 L.Ed.2d 71 (1991)).

The Court finds that the tactics used by Special Agent Mento during his interview of Velasco were not improperly coercive. Although Special Agent Mento admitted to screaming at Velasco, tactics such as a "raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne." Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993). Further, while Special Agent Mento told Velasco that he was "in a lot of trouble," "'[a] truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will…'" Simmons, 235 F.3d at 1133 (citing United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir.1978)); see also U.S. v. Gallardo-Marquez, 253 F.3d 1121, 1123 (8th Cir. 2001) (upholding statements as voluntary because the conduct of the police officers was not calculated to overbear defendant's will where the officers told defendant he would receive a life sentence when the sentence was for 32 years). Special Agent Mento's statement that Velasco was "in a lot of trouble" was a statement of a possible penalty for Velasco's actions, and the Court does not find that it constitutes coercive police activity.

Regarding the general surrounding circumstances of the interview, the Court finds that neither the fact that the period of interrogation – about an hour – nor the fact that the interview took place in a windowless, locked room, warrants a finding of

6

coercion. See U.S. v. LeBrun, 363 F.3d 715, 722-723 (8th Cir. 2004) (circumstances of interview were not coercive where defendant was interviewed in a small windowless room for approximately a half hour); United States v. Galceran, 301 F.3d 927, 930-31 (8th Cir. 2002) (ninety-eight minute interview in windowless conference room by two officers not found to be coercive). The Court finds that the environment of the interview was not coercive.

Finally, the fact that Velasco was not immediately presented to a magistrate judge following his arrest did not render his interview coercive. Velasco was arrested a little before 2:00 p.m. on April 4, 2007, and initially was held in state custody on state narcotics charges that day. The next day, April 5, 2007, Velasco was taken into federal custody, a federal complaint against him was issued, and he appeared before Magistrate Judge Jeanne Graham for his initial appearance.

Fed.R.Crim.P. 5(a)(1)(A) requires that "a person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise." However, when he was initially arrested, Velasco was held in state custody. Rule 4.02, subd. 5(1) of the Minnesota Rules of Criminal Procedure states, in pertinent part:

> An arrested person who is not released pursuant to this rule or Rule 6, shall be brought before the nearest available judge of the district court of the county where the alleged offense occurred or judicial officer of such court. The defendant shall be brought before such judge or judicial officer without unnecessary delay, and in any event, not more than 36 hours after the arrest, exclusive of the day of arrest, Sundays, and legal holidays, or as soon thereafter as such judge or judicial officer is available.

7

The amount of time that elapsed between Velasco's arrest and his interview, roughly an hour-and-a-half, and the period of time that passed before the complaint was signed and Velasco was brought before a magistrate judge for his initial appearance, did not amount to either a violation of Fed.R.Crim.P. 5 or a violation of Minn.R.Crim.P. 4.02. The court docket in this case shows that the Complaint was signed by Magistrate Judge Graham on April 5, 2007, and that Velasco appeared before Magistrate Judge Graham at 3:30 p.m. on the same day, just over 24 hours from the time of his arrest. See Docket No. 1; Docket No. 2. All of this occurred within the 36 hours prescribed by Minnesota law, and does not constitute an unnecessary delay under federal law. See e.g. County of Riverside v. McLaughlin, 500 U.S. 44, 56, 111 S.Ct. 1661, 1670 (1991) ("judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement"); U.S. v. Hernandez, 281 F.3d 746 (8th Cir. 2002) (overnight delay was neither excessive nor unnecessary); United States v. Noel, 231 F.3d 833, 837 (11th Cir. 2000) (delay of one week between arrest and first appearance did not violate Rule 5); United States v. Boyer, 574 F.2d 951, 955 (8th Cir. 1978) (a twenty-hour delay did not violate Rule 5 when defendant was arrested at 3:30 p.m., questioned for approximately two hours, and taken to the magistrate the following morning). Furthermore, "[Rule 5] does not bar the government from questioning an arrestee prior to being taken before a magistrate." U.S. v. Abreu, 730 F.Supp. 1018, 1031 (D.Colo. 1990) (citing Hayes v. United States, 419 F.2d 1364, 1367-1368 (10th Cir.1969)). The Court finds that Velasco was presented before a magistrate judge without unnecessary delay, and the fact that he did not immediately appear before a magistrate judge following his arrest did not amount to coercion.

8

In summary, in considering the totality of the circumstances of Velasco's interrogation, there is no evidence of police coercion, and the Court does not find that Velasco's will was overborne to the extent that his capacity for self-determination was impaired. Special Agent Mento did not threaten Velasco or make any promises to him. Although Special Agent Mento yelled at Velasco during the interview and told him that he was in "a lot of trouble", there was no indication that these interview techniques had any impact on Velasco. To the contrary, he remained calm throughout the interview and exhibited no fear. Further, Velasco never requested an attorney or invoked his right to remain silent, and at no time during the interview did he indicate that he was uncomfortable or that he needed anything. The following day, after the Complaint finding probable cause was signed, Velasco was then presented to a magistrate judge. The circumstances surrounding Velasco's statements do not require suppression.

### B. Motion to Suppress Evidence Derived from Search and Seizure

Velasco claims that because the statements he made to Special Agent Mento were involuntary, his consent for the agents to perform the subsequent search of his room at 58XX University Avenue NE was invalid because it was also involuntary, or, alternatively, was the result of a coerced confession. Therefore, Velasco argues that the evidence recovered during that search should be suppressed because it constitutes "fruits of the poisonous tree." See Def's Mem. at p. 4, citing Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407 (1963). This Court has already determined that Velasco's statements were validly given. Consequently, this Court also finds that the consent to search his home that Velasco gave during the same interview was also valid. Furthermore, the Court notes that Velasco signed a Consent to Search form, upon

9

which he acknowledged that he was advised of his right to refuse consent, that he was giving his permission voluntarily, and that he authorized the agents to take items they determined to be related to the investigation.  See Ex. 2.  For these reasons, the Court finds that the evidence recovered during the search of Velasco's room should not be suppressed.

## III.   CONCLUSION

The Court finds that Velasco's statements were validly obtained.  Velasco's consent to search his residence was also validly obtained, and the resulting search of 58XX University Avenue NE was proper.  On this basis, the Court recommends that Velasco's motion to Suppress Statements, Admissions and Answers [Docket No. 18] and his motion to Suppress Evidence Derived from Search and Seizure [Docket No. 23] be denied.

### RECOMMENDATION

For the reasons set forth above, it is recommended that:

1. Defendant David Israel Velasco's motion to Suppress Statements, Admissions and Answers [Docket No. 18] be **DENIED**.

2. Defendant David Israel Velasco's motion to Suppress Evidence Derived from Search and Seizure [Docket No. 23] be **DENIED**.

Dated:    June 19, 2007

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before **July 6, 2007** a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.